UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

|  |  |
|---|---|
| ADVANCE TRUST & LIFE ESCROW SERVICES, LTA, as securities intermediary for LIFE PARTNERS POSITION HOLDER TRUST, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> NORTH AMERICAN COMPANY FOR LIFE AND HEALTH INSURANCE, <br><br> Defendant. | Civil Action No. _____ <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Advance Trust & Life Escrow Services, LTA, as securities intermediary of Life Partners Position Holder Trust ("Plaintiff"), on behalf of itself and all others similarly situated, for its Complaint against defendant North American Company for Life and Health Insurance ("North American"), states as follows:

**NATURE OF THE ACTION**

1.   This is a class action brought on behalf of Plaintiff and similarly-situated owners of life insurance policies issued by North American or its predecessors-in-interest. Plaintiff seeks to represent a class of North American policyholders who have been forced to pay unlawful and excessive cost of insurance ("COI") charges by North American.

2.   The policies at issue in this case are universal life policies issued on standardized, printed form contracts by North American and its predecessors-in-interest. Universal life ("UL")

1

policies combine death benefits with a savings or investment component, often known as the "account value" or "policy value." A key feature of such policies is the "unbundling" or "transparency" of the various charges and credits. This means that the monthly deductions are broken down into an array of discrete charges and credits: the COI charges, other contractually-specified costs, and crediting rates. The Dictionary of Insurance Terms describes unbundled universal life insurance as "coverage in which the investment features, mortality element and cost factors of a life insurance policy are separated, permitting each part to be independently analyzed." The COI charge is the policy's unbundled insurance component and is used to cover the insurer's mortality risk. It is also referred to in the industry as the "mortality charge" or the "pure cost of protection."

3. Because COI charges are intended to compensate the insurer for mortality risk (i.e., the expected probability that the insured will die in a particular policy year), they are determined by the insurer based on its expectations as to future mortality experience. After issuance, an insurer is required to review the COI rates to confirm that they correctly capture the insurer's projected mortality costs. When mortality rates are projected to decline, the COI rates are required to be reduced.

4. This principle is inherent in the meaning of "cost of insurance," and is further embodied in the plain language of the policies at issue in this case, which expressly state that COI rates "are determined by us, based on our expectations as to future mortality experience"—and nothing else. North American imposes other charges through which it recoups administrative costs and earns a profit, such as a premium expense charge of 3% of each premium collected and an additional monthly expense charge of $5.00 per month.

5. By this agreement, the insurer is entrusted to dutifully decrease COI rates to reflect improved projected mortality experience. North American, however, has been abusing this trust and breaching its contractual commitment. In the face of decades of improving mortality rates since the subject policies were issued, North American has not reduced COI rates. Rather, it has kept the same rate scale in place for decades. In doing so, North American has improperly used COI charges not as a mortality-cost-recovery mechanism but as a profit vehicle. By retaining the difference between its projected mortality expenses and the higher COI rates charged to policyholders, North American has unlawfully earned tens—if not hundreds—of millions of dollars in extra profit over the past decade.

6. It is now well-documented that nationwide mortality expectations have *improved* significantly over the past several decades. The Society of Actuaries and the American Academy of Actuaries periodically publish mortality tables based on information collected from America's largest insurers. Those tables show that mortality rates have improved at a rate of roughly 1% per year over the past three decades. North American's own regulatory filings confirm that North American has benefited from this improvement and that it expects these historical trends to continue into the future. In its regulatory filings, North American indicates that it has experienced the same mortality improvement as the industry and expects it to continue. In its 2017 filing, for example, North American stated that "[c]urrently anticipated mortality experience factors as to mortality differ from current experience in that mortality improvement is assumed."

7. This means that North American has expected—and continues to expect—mortality rates to continue to go down and insureds to live longer than North American originally anticipated when the policies at issue were first priced. This, in turn, means that North

American's cost of providing insurance has decreased. Despite these continuously improved mortality expectations and corresponding decrease in mortality risk, however, North American has never once lowered the COI rates it charges its customers. North American has instead wrongly construed its policies as granting it a nonsensical "heads I win, tails you lose" power, reserving the right to increase COI rates if there were to be an unexpected pandemic that made mortality worse than anticipated, but not requiring it to decrease COI rates in the face of years and years of improved mortality experience and expectations—an improvement that has, in fact, already occurred. This position has no merit and North American has been violating, and continues to violate, the plain terms of its contracts with policyholders.

8.  North American's regulatory filings also indicate that North American is using impermissible factors to determine COI rates. In its 2008 regulatory filing, North American stated: "At the time that a universal life product is priced, the necessary cost of insurance rates are determined based on the then anticipated mortality." This language is consistent with the policy language. By the time of its 2012 regulatory filing, however, North American eliminated the reference to "anticipated mortality" and replaced it with a generic reference to multiple "pricing factors," stating: "At the time that universal life product is priced, the necessary cost of insurance rates are determined based on the then anticipated *pricing factors*. If future anticipated *pricing factors* vary from those anticipated at the time of initial pricing, the cost of insurance rates will be reviewed to see if a change is appropriate." In 2017, North American's regulatory filings went one step further, asserting that COI rates could be based not only on unspecified "anticipated experience factors," but also on "certain profit objectives and marketing objectives." This assertion directly conflicts with the plain language of the policies at issue, which state that COI rates will be "based on our expectations as to future mortality experience" and nothing else.

9. In sum, North American has violated the terms of the subject policies by failing to base cost of insurance rates on its expectations as to future mortality experience, and instead using cost of insurance charges as a way to bolster its profits. As a result of this misconduct, Plaintiff seeks monetary relief for the COI overcharges that North American has wrongly imposed and continues to impose on its customers.

## THE PARTIES

10. Plaintiff Advance Trust & Life Escrow Services, LTA is organized under the laws of Texas and is located at 1404 S. New Road, Suite 200, Waco, Texas 76711. Plaintiff is suing in its capacity as securities intermediary of Life Partners Position Holder Trust and is the owner of North American policy number L011936710 (the "Representative Policy"). This policy was issued by North American on August 9, 1993.

11. Defendant North American is a corporation organized and existing under the laws of Iowa and lists 4350 Westown Parkway, West Des Moines, Iowa as its statutory home office, main administrative office, and primary location of books and records in its most recent regulatory filings.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member (including Plaintiff) and one Defendant and the aggregate amount of damages exceeds $5,000,000. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

13. This Court has personal jurisdiction over North American because it is incorporated in Iowa and has its principal place of business in West Des Moines, Iowa.

14. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) because the events giving rise to Plaintiff's cause of action occurred in this District, including North American's determination of COI rates.

## FACTUAL BACKGROUND

### A. The Policies at Issue

15. The policies at issue are all flexible-premium, UL policies issued by North American or its predecessors-in-interest on Single Consideration Policy Forms[1] (the "Subject Policies"). They were all issued on standardized policy forms and insureds are not permitted to negotiate different terms.

16. UL policies combine death benefits with a savings or investment component, often known as the "account value" or "policy value." One benefit of UL policies is that they permit policyholders flexibility in the amount and timing of premiums necessary to keep the policies in-force. Unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for UL policies need only be sufficient to cover the COI charges and certain other specified expenses. The COI charge is deducted from the policy value (i.e., the savings component) of the policy on a monthly basis, so the policyholder forfeits the COI charge entirely to North American. Any premiums paid in excess of COI charges and other charges are applied to the policy value. These excess premiums earn interest at the credited rate. This structure is beneficial because it allows policyholders the choice to either (i) minimize their

---

[1] There are sometimes minor, yet immaterial, variations in the language used in Single Consideration Policy Forms. For example, while the Representative Policy states that COI rates will be "based on our expectations as to future mortality experience," other Single Consideration Policies may state "based on our expectations of future mortality experience," or "based on our expected future mortality experience," or "based on future mortality experience expectations." All policies issued on any Single Consideration Policy Form are included within the proposed Class.

capital investment and generate greater rates of return through other investments or (ii) to use the UL policy as a savings vehicle and earn interest on the account value.

17. The COI charge is part of the insurance component of a UL policy. It is supposed to be the insurer's cost of providing mortality coverage. The size of the COI charge is highly significant to universal life policyholders. First, it dictates the minimum amount of money that must be paid to keep a policy in force. Second, high COI rates can quickly diminish policy value and reduce the amount of money on which interest can be earned. Absent a secondary guarantee, if the policy value diminishes such that COI charges and certain other specified expenses can no longer be deducted, then the policy will go into grace and, if no additional premiums are paid after adequate time provided by an accurate grace notice, the policy may lapse. Third, higher current and illustrated future COI rates reduce the value of a policy in the secondary and tertiary markets.

18. The COI provisions in the Representative Policy are as follows:

**COST OF INSURANCE.** The cost of insurance for the Insured is determined on a monthly basis. Such cost is calculated as (1) times (2), where

    (1) is the cost of insurance rate as described in the Cost of Insurance Rates section.

    (2) is the net amount at risk, as defined in the Changing Death Benefit Options provision.

\*\*\*

**COST OF INSURANCE RATES:** The monthly cost of insurance rate is based on the sex, attained age, and rating class of the Insured. Policy duration is also a factor in determining the monthly cost of insurance rates....Monthly cost of insurance rates are determined by us, *based on our expectations as to future mortality experience.* Any change in cost of insurance rates applies to all individuals of the same class as the Insured. Under no circumstances are cost of insurance rates for insureds in that standard risk class greater than those shown in the Table of Guaranteed Maximum Insurance Rates.

This policy language provides that the *only* factor that North American can and must consider when determining COI rates is "our expectations as to future mortality experience." Nothing else. Because the COI rates on the Subject Policies must be based solely on expectations as to future mortality experience, COI rates must be adjusted downward if those expectations improve.

19. North American imposes other charges through which it recovers administrative expenses and earns a profit. This includes premium expense rate of 3% of all premiums and a $5 per month expense charge. This means that the Subject Policies are "fully unbundled": each component of the policy has a separate charge. North American also profits from the interest spread it earns on policyholders' account values (i.e., the difference between interest earned by North American on policy accounts and the amount of interest credited to policy accounts).

20. North American has issued other insurance policies that do not require it to base its COI rates on mortality alone when that is its intention. For example, North American has also received permission from regulators to issue policies on policy forms stating that COI rates will be "based on our expectations as to future experience for such elements as: investment earnings, mortality, persistency and expenses." This is what is known as a Multiple Consideration Policy Forms, as the language expressly allows the insurer to base COI rates on factors other than pure mortality, and converts the COI charge from a "pure mortality charge" to a "mortality *plus* charge." The Subject Policies were all issued on Single Consideration Policy Forms: no factor other than expected future mortality experience may be considered.

B. **North American Fails to Reduce COI Rates Despite Continued Mortality Improvement Over the Course of Three Decades**

21. A mortality table is a chart showing the rate of death at a certain age. Rate of death can be measured in terms of the number of deaths per thousand. Separate tables are produced to reflect groups with different mortality. Mortality tables will usually have separate

tables for gender. Mortality tables for use with individual life insurance policies additionally distinguish mortality rates for tobacco-use status, underwriting status, and duration since underwriting. Mortality tables are used by actuaries to calculate insurance rates and are designed to reflect mortality rate expectations.

22.   Beginning at least as early as 1941, the National Association of Insurance Commissioners (NAIC) has issued a series of Commissioners Standard Ordinary (CSO) mortality tables. These are industry standard mortality tables that are commonly used by insurers to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies. CSO tables are also incorporated into I.R.S. regulations to define what constitutes "life insurance," what constitute "reasonable mortality charges," and what is deductible for federal tax purposes.

23.   The 1980 table issued by the NAIC was called the 1980 Commissioners Standard Ordinary Smoker or Nonsmoker Mortality Table ("1980 CSO Mortality Table"). That table was the industry-standard table until 2001. In 2001, at the request of the NAIC, the Society of Actuaries (SOA) and the American Academy of Actuaries (Academy) produced a proposal for a new CSO Mortality Table. The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality Table was still the industry-standard table and (b) expected mortality rates had improved significantly each year since the 1980 table issued. The report stated:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted. . . . [C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.

24.   The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table." This means the tables are showing a substantial improvement in

9

mortality in a 20-year time period. These mortality improvements represent a substantial benefit that North American should have passed on to policyholders. The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table"). The 2001 CSO Mortality Table reflected vastly improved mortality experience as compared to the 1980 CSO Mortality Table.

25.    Since the 2001 CSO Mortality Table was introduced, the SOA has continued to conduct surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables. These surveys have consistently showed mortality improvements over the last three decades, particularly for ages 70-90. For example, the SOA published Individual Life Experience Reports for the periods 2002-2004; 2005-2007 and 2008-2009 each noting strong rates of improvement in mortality. North American was one of the surveyed companies included in each of these studies. Periodically the SOA will publish an updated table to reflect the evolving industry experience. Major updates they have published over the last few decades include: (a) 1990-95 Basic Select and Ultimate Mortality Tables; (b) 2001 Valuation Basic Mortality Table, (c) 2008 Valuation Basic Table, and (d) 2015 Valuation Basic Table. Each of these updates confirms that mortality had continued to significantly improve from the 2001 CSO Table. Other surveys have also noted mortality improvements. In May 2013, for example, the reinsurance company RGA published a report sponsored by the SOA enumerating mortality rates and mortality improvements at older ages, which showed material rates of mortality improvements.

26.    Despite this industry-wide improvement in mortality rates—and corresponding decrease in the cost of providing "pure death benefit protection"—North American has never decreased its COI rates for the Subject Policies.

27.  North American has acknowledged that, consistent with industry experience, its expectations as to future mortality experience have improved. Each year, insurers are required to file annual interrogatory statements with the NAIC. These are sworn statements that are certified and signed by an actuary. The interrogatories include questions regarding the setting of non-guaranteed elements (which include COI rates) and whether expectations have changed. For example, Question 4 asks: "Are the anticipated experience factors underlying any nonguaranteed elements [e.g., COI rates] different from current experience?" In its 2017 filing, North American stated: "Yes. North American understands current experience to refer to average credible experience over a reasonable recent period…Currently anticipated experience factors as to mortality differ from current experience in that mortality improvement is assumed." North American has therefore acknowledged that it has experienced a trend of improved mortality and admits that it expects this trend to continue. Further, North American has admitted in numerous filings that "[d]ifferences between anticipated experience factors and our experience at some future date may affect any or all of the non-guaranteed elements for the related products, subject to the terms of the contracts." But, despite repeating this type of statement in every annual statement for the past several years, North American has not reduced COI rates a single time.

28.  North American has even acknowledged on its company blog that mortality rates have decreased and that this should result in decreased costs of insurance. In an April 18, 2016 blog post entitled "Is Your Old Life Insurance Policy An Outdated Brick Phone?," which was intended to induce customers to convert their existing policies to new policies, North American's Jeff Ditsworth wrote:

> Fees and expenses mainly from what's knows [sic] as the "cost of insurance" may have decreased due to advancements in medical technology which has increased how long we live. Many life insurance policies written up until just a few years ago were based on mortality tables and medical assumptions from 1980. There are

11

>numerous medical conditions that even 10 years ago were assessed additional expenses such as high cholesterol, high blood pressure, and diabetes. Medical advancements have led to better treatment of these conditions, which increases how long we live. A decade ago, for example, someone with controlled hypertension may have faced an additional 150% to 200% cost of insurance, where today they may not.

Of course, one of the underlying principles of flexible-premium universal life is that decreases in the cost of insurance will be passed along to policyholders without the need to procure a new policy. But North American refuses to do so, presumably with the intent to encourage policyholders to either lapse or convert their existing policies and buy new ones (and pay the conversion costs associated therewith).

29. Beyond its failure to reduce COI rates in response to improved expectations as to future mortality experience, North American also is using impermissible factors in determining COI rates, and engaging in a practice known as "loading"—adding a margin on top of expected mortality rates—in violation of the Subject Policies. In its 2008 regulatory filing, North American stated: "At the time that a universal life product is priced, the necessary cost of insurance rates are determined based on the then anticipated mortality." This language is consistent with the policy language.

30. By the time of its 2012 regulatory filing, however, North American eliminated the reference to "anticipated mortality" and replaced it with a generic reference to multiple "pricing factors," stating: "At the time that universal life product is priced, the necessary cost of insurance rates are determined based on the then anticipated *pricing factors*. If future anticipated *pricing factors* vary from those anticipated at the time of initial pricing, the cost of insurance rates will be reviewed to see if a change is appropriate." This indicates that North American has attempted to impermissibly convert the Subject Policies from Single Consideration Policies to Multi-Consideration Policies.

31. Then, in 2017, North American's regulatory filing began stating that COI rates will be based not only on unspecified "anticipated experience factors," but also on "certain profit objectives and marketing objectives." This directly conflicts with the plain language of the policies at issue, which state that COI rates will be "based on our expectations as to future mortality experience" and nothing else. Any use of profit objectives in determining COI rates violates the terms of the Subject Policies.

32. North American has also concealed its wrongdoing: the monthly COI rates used to calculate COI charges are not disclosed to policyholders, nor are North American's mortality expectations. Indeed, North American's annual statements do not even separately itemize COI charges, instead grouping them with rider costs. And while experienced insurance experts may be able to access North American's regulatory filings, those filings also do not itemize COI rates and accessing them requires registration and payment of a fee, as well as interpretation by an experienced life insurance expert.

## CLASS ACTION ALLEGATIONS

33. This action is brought by Plaintiff individually and on behalf of a class pursuant to Rules 23(b)(3) of the Federal Rules of Civil Procedure. The class—referred to as the "COI Overcharge Class"—consists of:

> All current and former owners of universal life (including variable universal life) insurance policies issued or insured by North American Company for Life & Health Insurance, or its predecessors, that provide: (1) an insurance or cost of insurance charge or deduction calculated using a rate based on expectations as to future mortality experience; (2) additional but separate policy charges, deductions, or expenses; (3) an investment, interest bearing, or savings component; and (4) a death benefit.

The COI Overcharge Class does not include defendant North American, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

34. The class consists of hundreds of consumers of life insurance and are thus so numerous that joinder of all members is impracticable. The identities and addresses of class members can be readily ascertained from business records maintained by North American.

35. The claims asserted by Plaintiff are typical of the claims of the COI Overcharge Class.

36. Plaintiff will fairly and adequately protect the interests of the class and does not have any interests antagonistic to those of the other members of the class.

37. Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters and COI matters, as well as class and complex litigation.

38. Plaintiff requests that the Court afford class members with notice and the right to opt-out of any class certified in this action.

39. This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the class predominate over any individualized issues. Those common questions that predominate include:

(a) the construction and interpretation of the form insurance policies at issue in this litigation;

(b) whether North American's actions in failing to decrease the cost of insurance charges imposed on the COI Overcharge Class violated the terms of those form policies;

      (c)    whether North American based its COI charges on factors other than expectations as to future mortality experience;

      (d)    whether North American breached its contracts with Plaintiff and members of the class;

      (f)    whether North American's expectations as to future mortality experience have improved; and

      (g)    whether Plaintiff and members of the class are entitled to receive damages as a result of the unlawful conduct by North American as alleged herein and the methodology for calculating those damages.

40.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

      (a)    the complexity of issues involved in this action and the expense of litigating the claims, means that few, if any, class members could afford to seek legal redress individually for the wrongs that North American committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

      (b)    when North American's liability has been adjudicated, claims of all class members can be determined by the Court;

      (c)    this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d) without a class action, many class members would continue to suffer injury, and North American's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of their wrongful conduct; and

(e) this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

41. Plaintiff realleges and incorporates herein the allegations of the paragraphs above of this complaint as if fully set forth herein. This claim is brought on behalf of Plaintiff and the COI Overcharge Class.

42. The Subject Policies are binding and enforceable contracts.

43. North American breached its contracts, including the covenant of good faith and fair dealing, with Plaintiff and the COI Overcharge Class by failing to determine COI rates based on expected future mortality experience and deducting COI charges calculated based on those unlawful rates. Plaintiff's and the COI Overcharge Class's damages include, but are not limited to, the excess COI charges that North American deducted by not reducing COI rates based on improved mortality.

44. Plaintiff and the COI Overcharge Class have performed all of their obligations under the policies, except to the extent that their obligations have been excused by North American's conduct as set forth herein.

45. As a direct and proximate cause of North American's material breaches of the policies, Plaintiff and the COI Overcharge Class have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the COI Overcharge Class pray for judgment as follows:

1. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. Awarding Plaintiff and the Class compensatory damages;

3. Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as costs; and

4. Awarding Plaintiff and the Class such other relief as this Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and the Class hereby demand a trial by jury as to all issues so triable.

Dated: October 29, 2018                Respectfully submitted,

HOPKINS & HUEBNER, P.C.

By_____
R. Ronald Pogge                AT0006374

By_____
Robin G. Maxon                 AT0005005
2700 Grand Avenue, Suite 111
Des Moines, IA 50312
Phone: 515-244-0111
Fax: 515-697-4299
Email: rpogge@hhlawpc.com
       rmaxon@hhlawpc.com

Steven G. Sklaver
(*pro hac vice* application to be filed)
Glenn C. Bridgman
(*pro hac vice* application to be filed)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel:   310-789-3100
Fax:   310-789-3150
ssklaver@susmangodfrey.com
gbridgman@susmangodfrey.com

Seth Ard
(*pro hac vice* application to be filed)
Ryan C. Kirkpatrick
(*pro hac vice* application to be filed)
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel.:   212-336-8330
Fax:   212-336-8340
sard@susmangodfrey.com
rkirkpatrick@susmangodfrey.com

ATTORNEYS FOR PLAINTIFF